**KATZ LAW OFFICE PC**
Michael Katz, Esq. (SBN: 181728)
Email: mkatz@katzruby.com
650 Town Center Drive, Suite 1500
Costa Mesa, CA 92626
Telephone: (949) 724-0900
Fax: (949) 724-0901

*Attorney for Plaintiff Nathan Rogers*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

NATHAN ROGERS, an individual,

       Plaintiff,

    v.

CONOR PETERSEN, an individual;
and, THUNKSPACE, LLC, a
Washington limited liability company,

       Defendants.

Case No. 3:23-cv-3281

**COMPLAINT**

**JURY TRIAL DEMANDED**

**TO THIS HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD HEREIN:** Plaintiff Nathan Rogers, an individual, hereby alleges as follows:

## I.      THE PARTIES

1.      Plaintiff Nathan Rogers is a software engineer.

2.      At all times relevant to this matter, Rogers was a citizen and resident of San Francisco, California.

3.      Rogers is presently residing in Chicago, Illinois, with the intent to return to San Francisco, California.

4.      On information and belief, Defendant Conor Petersen is, and at all relevant times was, a citizen and resident of Seattle, Washington.

5.      On information and belief, Defendant Thunkspace, LLC ("Thunkspace") is a limited liability company organized and existing under the laws of the state of Washington, with its principal place of business in Seattle, Washington.

6.      On information and belief, Thunkspace is a single member LLC, with Petersen acting as its sole managing member. *See* Exhibit A.

7.      Petersen hosts a personal website at www.conorpetersen.com.  On his website, Petersen holds out himself as reachable via email at business@thunkspace.com. *See* Exhibit B.

8.      On information and belief, Thunkspace operates as the agent and/or alter ego of Petersen.

## II.      JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this matter based on federal question jurisdiction under 28 U.S.C. § 1331 and 17 U.S.C. §§ 501 *et seq*.

10.      This Court has also subject matter jurisdiction over this matter based on the diversity of citizenship under 28 U.S.C. § 1332(a)(1), as there exists complete diversity between the parties and the amount in controversy, exclusive of

interest and costs, greatly exceeds the $75,000 jurisdictional minimum.

11.   This Court has supplemental jurisdiction over all asserted state law claims pursuant to 28 U.S.C. § 1367 because all state law claims are so related to, and arise from, the same common nucleus of operative facts from which the federal claims arise and, therefore, they form part of the same case or controversy under Article III of the United States Constitution.

12.   This Court has personal jurisdiction over Petersen because he partnered with Rogers to develop the online game *5D Chess With Multiverse Time Travel* ("5D Chess") while Rogers was domiciled in California.

13.   Petersen proposed and entered into a profit-sharing agreement with Rogers when, on April 7, 2019, he sent Rogers two emails detailing their arrangement to build 5D Chess and share future profits from it (hereinafter, the "Agreement").  A true and correct copy of those emails, constituting the Agreement, is attached as Exhibit C. Petersen negotiated and entered into that Agreement while Rogers was a citizen of, and domiciled in, California.

14.   In furtherance of their common enterprise to create 5D Chess and their subsequent profit-sharing Agreement, Petersen repeatedly directed his activities into California in the form of successful or attempted videoconference calls (via Google Hangouts) on sixty-two occasions from the period of January 11, 2019, to May 19, 2019.

15.   Rogers completed his work in California, and at no point did Petersen expressly request, imply, or insinuate that Rogers would need to relocate or otherwise satisfy any obligation of the Agreement outside of California.

16.   When Rogers wrote the code in California, he stored it on his laptop's local hard drive, with backups saved to cloud-based providers.

17.   On information and belief, Petersen knew and had no reason to believe otherwise that Rogers would choose to live, work, or perform under the contract anywhere other than San Francisco, California.

18.     On information and belief, Petersen transferred the intellectual property of 5D Chess to Thunkspace.  Thunkspace thereby benefited from the deal struck with Rogers in California and the work Rogers performed in California.

19.     Each cause of action herein against Defendants arises out of the activities Petersen purposefully directed at Rogers while Rogers was domiciled in California.

20.     Furthermore, the Court has personal jurisdiction over both Defendants because, on information and belief, they conduct regular business in California through sales of 5D Chess and derive revenue from interstate commerce directed at California and this District.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

22.     Divisional Assignment: Assignment to the San Francisco division or the Oakland division is appropriate since the events or omissions giving rise to the claims occurred in the city and county of San Francisco, California.

### III.     GENERAL ALLEGATIONS

**A.     The Parties' Relationship Dates Back to High School.**

23.     In 2009, Petersen met Rogers in high school at Evanston Township High School in Evanston, Illinois.

24.     They kindled a friendship over a shared passion for computer games and strategy games, like chess.

25.     After high school, Rogers and Petersen kept in touch through college and beyond, playing games on Steam about once a week.  Steam is a video game digital distribution service and online storefront.

26.     Rogers and Petersen also regularly corresponded over Steam Chat, a native chat feature within the Steam platform.

27.     In 2016, Rogers began work at YouTube in San Bruno, California.  In

2018, he moved to San Francisco, California, where he transitioned to work at Google as a software engineer.

**B.     After Years of Playing Online Games, Rogers and Petersen Decided to Create Their Own.**

28.     Since 2012, Petersen and Rogers actively played an online game called Dota 2.  Published by Drodo Studio, Dota 2 is a multiplayer online battle arena game.

29.     On January 4, 2019,[1] Drodo Studio released a game modification called Dota Auto Chess, which loosely integrated elements from chess into Dota 2's existing gameplay.  For example, it uses a checkered grid-based board.

30.     Colloquially, Dota Auto Chess falls within a relatively a new genre of online games known as "auto battler" games (where "auto" is short for "automatically").[2]

31.     In "auto battler" games, each player picks several characters—often fantasy characters, *e.g.*, a Tolkienesque orc—to fight for their respective side.  The characters then fight each other on a chessboard-like grid with superficial autonomy, guided by artificial intelligence rather than direct player control.

32.     Inspired by that new genre of "auto battler" games, Petersen and Rogers decided to create their own online auto battler game.

33.     Even though they had not fully aligned on a final vision of their new game, they intended that their game would introduce new strategic game mechanics.  For example, they envisioned and wrote the code for a fantasy character called a "Gardener," a character who wielded powers to change the very chess board itself.

---

[1] Hereinafter, all dates are in 2019 unless otherwise noted.
[2] For a primer on "auto battler" games, *see* Matt Fox, "Spawn Point: What on earth is an auto battler?" *Rockpapershotgun.com* (Aug. 1, 2019), available at:  https://www.rockpapershotgun.com/what-is-an-auto-battler (accessed June 22, 2023).

34.     They also intended that their game would start as a one-on-one game, closer to traditional chess and unlike Dota Auto Chess, which allowed up to eight players to play in a free-for-all.

35.     From the outset, Rogers and Petersen mutually intended to bring the game to market and be available for purchase for anyone to play online.

36.     They intended to iterate on the game over time.

37.     In order to iterate on the game's development, they needed a game server and networking code to test, build, design, and prototype game development. Between the two of them, Rogers had the skills and expertise to build that server and network.

**C.     Rogers Wrote the Code and Built the Backend Foundations of 5D Chess.**

38.     On or before January 11, Rogers and Petersen held a meeting over videoconference, where they began to design the architecture of their still-to-be-defined game's backend.[3]  The backend's architecture laid the foundations for the game's entire development and subsequent functionality.  That architecture included design of the game's "clients," "servers," and "operations."

39.     A "game client," in this context, is defined as an executable software program that runs on an individual player's computer. It helps render the visual representations on the computer screen and any accompanying sound.  Game clients also establish a network connection between the player's computer and the game's server.  In doing so, the game client performs a key function: it facilitates the sending and receiving of commands back and forth to the game server, thereby enabling game play.  For example, if Player One moved her bishop from F1 to G2, then the game client for Player One would send that command back to the game server, so the bishop's movement would appear on Player Two's screen via Player Two's game client.

---

[3] For a conventional definition of "backend," *see* P. Christensson, "Backend Definition," *TechTerms.com* (Apr., 11, 2020), available at: https://techterms.comhttps://techterms.com/definition/backend (accessed June 20, 2023).

40.     A "game server," in this context, is a centralized network program that performs matchmaking and transmits commands and game states between game clients.  For example, if Sally in South Dakota wants to play chess online, and so does Bob in Nevada (but neither person knows one another), then the server would effectively place matchmaker, putting Bob and Sally in the same chess game.  As their chess game unfolds, the server would facilitate changes in the game state (*i.e.*, by transmitting the commands back and forth between their respective game clients).  Additionally, the server would preserve the game state if the players got disconnected.  For instance, if Bob suddenly loses WiFi and needs to reconnect, then the server would keep the chess pieces' positions intact from his last move.

41.     "Game operation," in this context, refers to the act of taking a command (or any element of game play) and serializing it into binary data—0s and 1s.  In other words, game operation refers to the fundamental code that converts game play actions into the raw binary data that gets transmitted through network sockets.  For example, when Player One moves bishop from F1 to G2, "bishop" could be translated into 0-1-0-1-0-1, "F1" into 1-1-1-1-0-0, and "G2" into 0-0-1-0-1-1.[4]

42.     After Rogers and Petersen aligned on the overall backend architecture, Rogers got to work.  He began coding those fundamental elements, starting with the network socket code and the code for serializing and deserializing game commands.  Network socket code refers to the code that interfaces between the computer's operating system (*e.g.*, Windows or MacOS) and the game's software.  Rogers's code for serializing and deserializing translates commands into 1s and 0s.

43.     Around the same time, Rogers started building the code repository for the server.  A repository is a place to store code.  It logs changes in the code (known as "commits") and allows multiple people to work on the body of code in

---

[4] Those particular patterns of binary code are not real; they are only meant as illustrations.

parallel. Initially, development of 5D Chess started in two separate repositories, one for the game's client (dubbed, tellingly, as "autochess") and one for its server (dubbed "autochess server").  A few weeks into the development, Rogers merged the server code into the "autochess" repository on January 28.

44.     After Rogers finished setting up those repositories, Rogers turned to work on the game server.  At the time, he wrote code to serialize log-ins, header sizes, and interactions with network sockets.

45.     Around the same time that Rogers had started work on the code, Rogers collaborated with Petersen to develop the game's overall mechanics, design, and game play.  To wit, on January 20, Petersen invited Rogers to edit and work on a Google Document entitled "Fantasy Auto Chess."  Rogers collaborated with Petersen on that Google Document, which, on information and belief, contained notes of their discussions and decisions about the game's design, mechanics, and gameplay.  Rogers's access to that Google Document has since been revoked.

46.     From January through May, Rogers developed the software infrastructure for user authentication, which entailed: (a) writing the code to store user information (*i.e.*, a player's username, password, and metadata) in a database; (b) writing the code to look up that user authentication information on the server; (c) writing the code to use that user authentication information on the server (*i.e.*, authenticate a connection and map game actions to the user's identity) and have the game's clients transmit that information; and, (d) writing the code to integrate with libsqlite3, a C library that implements an in-process SQL database engine (without which, the game server could not practicably store structured, persistent information, which is needed for user accounts, match history, and other data).

47.     From January through May, Rogers integrated the server, clients, and game operations.  He coded: (a) the infrastructure for sending HTTP requests on the client side, including integration with libcurl (a URL transfer library); (b) the socket connection between the client and server, which involved serializing logical game

actions (*e.g.*, moving a chess piece forward by one square) into raw binary data to send over the wire to the server (and the reverse); (c) the code for managing active games across all players on the server; and (d) the build scripts for both the client and server, which supported (i) multiple build configurations (*e.g.*, developer builds, also known as "debug builds," which attach debugging tools to running applications; release builds, which optimize for run-time efficiency and omit developer-specific information), (ii) parallel builds (*i.e.*, direct the software program to utilize all CPU cores in parallel, rather than run tasks sequentially), and (iii) the ability to cache intermediate build files—a technique that helps avoid rebuilding source files that do not change.

48.   From January through May, Rogers also built miscellaneous utility files and scripts,[5] including: (a) code to get more descriptive stack traces,[6] used on both the client and the server; (b) code for deferred function calls[7] in C++[8]; (c) code for synchronizing data across concurrent threads, including thread safe communication;[9] (d) code for structured log messages,[10] used in both the client and servers; (e) utilities for assertions;[11] (f) Python build scripts (*i.e.*, code that helps a compiler convert source code in text files into executable binary code) for both the

---

[5] Utility files and scripts, in the software engineering context, refer to general purpose software code that can be reused in different contexts within the same application or even across applications.  For example, someone could write a piece of code that converts integers (*e.g.*, "4," "1," or "37") into written numbers (*e.g.*, "four," "one," or "thirty-seven"). That code could then be imported for different uses across the software application.

[6] When system crashes occur, stack traces help developers determine what happened and diagnose the problem.

[7] Deferred function calls enable programmers to write code to be run later in the program automatically, rather than forcing programmers to remember to later run those functions manually.

[8] "C" and "C++" and "Python" refer to programming languages.

[9] Sophisticated software programs need to run multiple tasks, or "threads," simultaneously. Synchronizing data across concurrent threads not only for better for performance, but is necessary for many software programs, like fast-paced computer games, to work.  "Thread safe" means the code allows for data to be correctly accessed or modified from multiple threads simultaneously, without the risk of error.

[10] Log messages are messages from the software program itself, meant to communicate the updates on the internal mechanics of the software to the user or developer.  For example, after running the code with incorrect user credentials, a log message may say "`user authentication failed: access DENIED.`"

[11] Assertions, in the programming context, refer to logical checks and balances within software code that halts the program from running incorrectly. For example, if the program is designed accept user passwords only over 16 characters in length, a software assertion will stop the code from accepting and storing an impermissible 8-character password in the user authentication SQL database.

client and server, included caching and parallel build support; (g) utility macros for object construction in C++; (h) utility code for programmers (like Rogers or Petersen) to log-in to the programming consoles, which enabled them to code more quickly and efficiently.

49.     Without the code, scripts, servers, and other infrastructure Rogers designed and built, 5D Chess would not exist or, at the minimum, it would be inoperable.

50.     Throughout this time, Rogers performed other work outside of the development of the game's idea, mechanics, or code base. Namely, he performed maintenance and testing work, such as: (a) demoing code that they wrote for each other; (b) testing and debugging code that Petersen wrote or code that they co-wrote together; (c) trading tips and best practices for programming in the C++ language; and (d) fixing compiler issues on Linux and Windows machines.

**D.     Petersen Formalizes His Arrangement with Rogers.**

51.     Originally, Petersen and Rogers orally agreed to split the profits from the game evenly, split fifty-fifty.

52.     On information and belief, Petersen was unemployed during this time, *i.e.*, from January through May of 2019.

53.     By April, Petersen had grown resentful of Rogers's full-time employment.

54.     On April 7, Petersen made a proposal, whereby he sent Rogers two emails detailing the scope of their Agreement. Those emails list out Petersen's and Rogers's respective responsibilities and compensation. *See* Exhibit C.

55.     With respect to ownership, Petersen's email states: "The game will be published under an entity entirely owned and managed by me . . . . I own the game, all copyrights related to the art/name of the game, all my code, and have unlimited right to use your code for this game."

56.     On information and belief, that entity, to which Petersen referred in his email, is Thunkspace.

57.     With respect to compensation, Petersen's email states: "You get 20% of profit from the game."

58.     Petersen defined "profit" as "dollars after storefront/publishing costs."

59.     In his follow up email, Petersen adds an amendment concerning music, stating "it's either my responsibility or we agree to pay licensing/commission to get music, payed [sic] before profit."

60.     Rogers felt that it was appropriate to accept an uneven split of the profits because Petersen was unemployed at the time, whereas Rogers was employed by Google.

61.     On April 9, 2019, Rogers accepted the agreement with written notice via email, replying: "Looks good to me.  Agreed."

**E.      Rogers Continues to Perform Under the Agreement.**

62.     After agreeing to Petersen's terms, Rogers continued to work on the development of the code for what would become 5D Chess.

63.     Illustrative of that work, Rogers continued to build out and improve the source code.  By April 27, Rogers had: (a) developed the code that allows a user to log in using a token on the disk rather than retyping a username and a password each time; (b) fixed a bug where the server would break if it was backgrounded; (c) removed an "openssl" reference in the client and server; (d) improved the networking and server logic to support more HTTP commands (*e.g.*, allowing the application to send both "GET" and "POST" commands from the client),[12] along with choosing the right method for the right operation; and, (e) added logic in the code to handle dropped connections.

---

[12] HTTP stands for "hypertext transfer protocol."  HTTP commands like "GET" allow a client, like a Google Chrome browser, retrieve certain information from, say, a website's server.

64.     On April 28, Rogers finished adding the ability to pass authentication tokens in from the command line.

65.     On May 6, Rogers finalized adding support for creating games via friend codes, which was updated into the 5D Chess source code.

66.     On May 11, Rogers published the following updates to the code: (a) designed and coded logic for cleaning up inactive games on the server; (b) added a support feature for debugging and release builds for both client and server, whereas previously that feature only existed for debugging; (c) coded a support feature for canceling friend code games; and, (d) coded the ability for the game to provide notifications for players joining and leaving game queues.

67.     In total, Rogers estimates he spent approximately 200 hours designing, building, and implementing the code for Rogers and Petersen's auto battler chess game.

**F.      Petersen Goes Radio Silent.**

68.     From January through May 2019, Rogers and Petersen routinely met to discuss and work on 5D Chess on Google Hangout three to four times a week. During that time, Rogers and Petersen had also been regularly communicating over Steam Chat.

69.     In May, Petersen's started acting more hostile, and their relationship began to deteriorate.  Rogers and Petersen's last videoconference call occurred on May 19.

70.     On May 23, Petersen "unfriended" Rogers on Steam, equivalent to blocking someone on a social media website.

71.     That same day, Rogers attempted to reach out to Petersen via Google Meet, but Petersen did not accept the call.

72.     Thereafter, Petersen cut off all contact, despite years of friendly communication and intensive work together.

73.     After May 23, Rogers received no further communication from Petersen.

**G.     5D Chess Launches under the Thunkspace Banner.**

74.     On December 12, Petersen incorporated Thunkspace, unbeknownst to Rogers.

75.     On information and belief, Petersen assigned his Agreement with Rogers to Thunkspace.  In the alternative, Petersen rendered Thunkspace the third-party beneficiary of Petersen's Agreement with Rogers.

76.     According to Thunkspace's public Twitter account, Thunkspace published 5D Chess on July 22, 2020.  Petersen's personal website also contains a post publicizing 5D Chess, dated July 22, 2020.

77.     Rogers was unaware of any connection between 5D Chess and Petersen until January 2021.  Up until that time, Rogers had no reason to believe a breach of contract had occurred, as he had no contact from Petersen and no information concerning whether (or not) Petersen was even moving forward with bringing their "autochess" game—that is, 5D Chess—to market.

78.     In January 2021, Rogers purchased a copy of 5D Chess.

79.     Rogers launched the game and reviewed the disassembly of the binary code, where he discovered idiosyncrasies in the source code unique to his naming conventions in style of coding.  For example, compare the naming convention from Rogers's code for a socket command highlighted below:

```
nathan:~/.local/share/Steam/steamapps/common/5dchesswithmultiversetimetr
avel$ objdump -d 5dchesswithmultiversetimetravel | grep -P '>:' |
c++filt | less
shows function called:
000000000009da30 <create_client_socket(char const*, char const*)>:
```

with the Linux code of the published version of 5D Chess highlighted below:

```
SOCKET CreateClientSocket(const char* server_url, const char*
```

```
server_port) {
    struct addrinfo* servinfo = nullptr;
```

80.   "create_client_socket", a function that Rogers designed, is an extremely specific function name, one so specific that the odds of someone else independently naming it as such are small.

81.   The exact match of two "const char*" within the function's parentheses (also known as its "signature") is also, itself, rare and highly unusual.[13]

82.   Combined, the probability that both idiosyncrasies appeared due to chance in the 5D Chess—right next to each other, no less—are infinitesimally small.

83.   Even more telling, Rogers discovered more of his idiosyncrasies in the disassembled 5D Chess code.  These thumbprints indicate Petersen, Thunkspace, and/or their agents or employees directly integrated Rogers's code into the 5D Chess source code.

84.   Defendants are using Rogers's code without his permission and without having compensated him.

85.   And yet, to Rogers's surprise, Defendants publicly listed Rogers in the credits of the game, acknowledging him for his invaluable contributions to 5D Chess.  Defendants have effectively conceded that Rogers's labor, skill, intellectual property, and design contributions were used in the making (and/or current operation) of 5D Chess.  *See* Exhibit D.

86.   In April 2023, Rogers visited the 5D Chess profile on SteamSpy, a third-party service that estimates the number copies of games sold on the Steam platform.  At that time, he discovered that 5D Chess had between 500,000 and 1,000,000 "owners"—that is, users who have purchased the game. Up until this

---

[13] The visible differences, represented in the parentheses above, are a result of the code disassembly process. Otherwise, Rogers's copy of the code and 5D Chess's binary code would appear exactly the same when compiled.

time, Rogers still had no reason to suspect that the Agreement may have been breached, since he did not stay apprised of 5D Chess or its commercial success.

87.     However, in view of that purchase data, Rogers believed there was a good chance that he had been deprived of profits in contravention of the Agreement.

**H.    Rogers Suffered Damages.**

88.     The sales price of 5D Chess is $11.99. On information and belief, the price of 5D Chess has remained unchanged since its release, except for a brief period where it went on sale for $5.99 in April and May of 2023. *See* Exhibit E. As of June 2023, it is no longer on sale and has returned to the full price.

89.     Based on the foregoing allegations, Rogers estimates that 5D Chess has earned between $5,995,000 and $11,990,000 in revenue from the date of its release until April 2023.

90.     On information and belief, server costs for 5D Chess do not exceed several hundred dollars per year given the low amount of CPU and bandwidth needed to operate the game.

91.     On information and belief, Steam charges a flat $100.00 fee to onboard a game onto its platform and then takes a 30% commission for each sale.

92.     Based on the foregoing allegations, Rogers estimates that 5D Chess has netted somewhere between $4.2 million and $8.3 million in "profit," as the term profit is defined by Rogers and Petersen's Agreement.

93.     Under the Agreement, Rogers is entitled to 20% of those profits and all future profits.

## IV.    CLAIMS FOR RELIEF

### First claim for relief: Breach of Contract

### (Against All Defendants)

94.     Rogers incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

95.     The existence of a contract is a question of fact. *See* 17A Am. Jur. 2d Contracts § 18 (2021).

96.     California law applies to the Agreement because "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Cal. Civ. Code § 1646.

97.     Petersen is capable of entering in contractual agreements.

98.     Petersen authored the Agreement.

99.     The Agreement constitutes a contract because, among other things, it details each party's respective duties and the consideration thereof.

100.   Petersen emailed the Agreement to Rogers, who was domiciled in California at the time.

101.   Rogers accepted the offer on April 9, 2019, via email, while living in California.

102.   The Agreement was therefore formed in California.

103.   Petersen voluntarily entered into and executed the Agreement, which was a binding contract that required ongoing duties by Petersen.

104.   Petersen received valuable consideration for his promise to share 20% of the profits of 5D Chess—namely, Rogers's time, labor, and expertise in software engineering and creativity with gameplay ideation from years of playing these online games together.

105.   While a resident of California, Rogers designed and wrote the code contemplated under the Agreement, while providing other valuable ideas, testing, debugging, and work product, as alleged herein.

106.   To the extent Rogers did not perform under the contract, that nonperformance is excusable. Petersen's cessation of all communication frustrated any efforts to continue building the code base for 5D Chess. Moreover, some of the work contemplated by the Agreement simply could not be started until a full

version of the game was designed in at least one operating system (*e.g.*, it would have been impossible to get dependencies working for an Android port when the game itself had not been completed). Specifically, bullet points three and four under the Agreement header "Server features excluding server-side gameplay logic" and the bullet points under the Agreement header "Android port" would not have been possible to start or complete during the timeframe that Petersen engaged with Rogers. *See* Exhibit C.

107. On information and belief, Petersen transferred Rogers's intellectual property to Thunkspace, an LLC that he manages and controls.

108. On information and belief, Petersen assigned his Agreement with Petersen to Thunkspace, an LLC that he manages and controls.

109. Thunkspace has benefited from the work Rogers performed, as 5D Chess has reaped millions of dollars in revenue over the past three years.

110. Neither Petersen nor Thunkspace has paid Rogers or otherwise compensated him in any way.

111. As a direct and proximate result of Defendants' breach of contract, Rogers has suffered harm: namely, he has lost out on 20% of the profits from 5D Chess.

112. 5D Chess continues to earn revenue and is expected to earn more revenue in the future. As such, it is expected to earn more profit in the future, too.

113. Because the breach of the profit-sharing agreement is a continuous and ongoing breach, an award of legal damages is inadequate because (a) it would not compensate for Rogers's right to 20% of prospective future profits, and (b) it would only encourage a treadmill of litigation to recover future profits as they accrue.

114. The terms of the Agreement are sufficiently certain.

115. The existence of 5D Chess, its success, and its ongoing use of code written and designed by Rogers, among other indicia, demonstrates Rogers's performance or substantial performance under the Agreement.

116.   Rogers is therefore entitled to specific performance of the Agreement in perpetuity.

117.   In the alternative, Rogers is entitled to actual damages of at least $1,678,481, *plus* interest, *plus* one-fifth (20%) of the expected value of future profits from 5D Chess, or in an amount otherwise according to proof.

**Second claim for relief: Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(Against All Defendants)**

118.   Rogers incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

119.   A written contracted existed between Rogers and Petersen.

120.   Inherent in every contract is an implied covenant that no party will intentionally do anything or fail to do something to deprive the other of the benefit of the contract.

121.   Petersen's obligation to act in good faith with Rogers was created by Petersen's execution of the Agreement, which is a lawfully binding contract.

122.   Petersen failed to act in good faith by, inter alia, ceasing and breaking off all communication with Rogers after May 2019, stonewalling Rogers when Rogers made good faith efforts to reach out, and then continuing to leverage Rogers's work for the benefit of himself (and later his alter ego, Thunkspace) without compensating Rogers in the manner contemplated in the Agreement.

123.   Those actions frustrated the common purpose of Rogers's and Petersen's common enterprise and subsequently interfered with Rogers's ability to receive the benefit of the Agreement.

124.   As a direct and proximate cause of Defendants' breach of the implied covenant of good faith and fair dealing, Rogers has suffered and continues to suffer actual damages of at least $1,678,481, *plus* interest, *plus* one-fifth (20%) of the

expected value of future profits from 5D Chess, or in an amount otherwise according to proof.

**Third claim for relief: Fraudulent inducement**

**(Against All Defendants)**

125.   Rogers incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

126.   Prior to incorporating Thunkspace, Petersen acted in concert with Rogers as an unincorporated joint venture, as they combined their engineering skills or knowledge of online computer games with the shared intent to carry out the business undertaking of launching and commercializing a new "auto battler" game.

127.   Prior to signing the Agreement, the intellectual property undergirding 5D Chess belonged jointly and severally to the joint venture of Petersen and Rogers.

128.   Signing the Agreement altered the ownership of the intellectual property in exchange for clarity around future profit sharing.

129.   On April 7, 2019, Petersen induced Rogers to effectively transfer all of Rogers's copyright, intellectual property, and code under false pretenses—namely, by stating in writing that he, Petersen, would later pay Rogers his agreed-upon share of the profits earned from 5D Chess.  *See* Exhibit C.  Petersen made those false representations on behalf of, and in order to benefit, himself and his subsequent alter ego, Thunkspace, as indicated expressly in the Agreement.

130.   On information and belief, Petersen never intended to honor his contractual promises when they were made, evidenced by his subsequent cessation of all communication weeks after Rogers delivered the necessary code, despite a decade-long relationship filled with frequent communication.

131.   In agreeing to turn over his copyright in the contract, Rogers reasonably relied on Petersen's assurances that he would be compensated as contemplated in their Agreement.

132. Rogers did not know that Petersen's representations were false. Rogers only discovered, or had reason to discover, that the representations were false in July 2021, when he discovered that 5D Chess was earning sufficient revenue to be profitable.

133. One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers. *See* Cal. Civ. Code § 1709.

134. Had Rogers not been fraudulently induced to disclaim his copyright and ownership in the game, he would still own the copyright to his code, without which the game could not otherwise operate, and he would still jointly and severally own his intellectual property in 5D Chess overall from his design contributions as a co-equal partner in their unincorporated joint venture.

135. On information and belief, the economic value of Rogers's contributions is at least half of the fair market value of 5D Chess, including past and future discounted cash flows. Because the full fair market value of 5D Chess is at least $8.4 million, Rogers has suffered damages of at least $4.2 million or more, or an amount subject to proof, due to Defendants' fraudulent inducement.

**Fourth claim for relief: Breach of Implied-in-Fact Contract**
**(Against Petersen)**

136. Rogers incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

137. The conduct, situation, and material relations of Petersen gives rise to an inference that Petersen promised to provide Rogers with the future profits from the sale of 5D Chess for the work he performed developing the source code for the game, even prior to, or absent of, his express written Agreement.

138. In particular, Rogers and Petersen's collaboration and virtual conferencing from early January through April 9, 2019, shows that they worked on the game's development together, and their joint collaboration demonstrates the

1  shared understanding that they would both benefit from the development,

2  commercialization, and/or sale of 5D Chess.

3     139.   Petersen breached his implied contract with Rogers by failing to

4  provide and refusing to provide Rogers with Rogers's share of profits owed to him

5  for his work developing the software undergirding 5D Chess.  Rogers would have

6  been entitled to half of the profits, but so far has received none.

7     140.   Therefore, as a direct and proximate result of Petersen's breach of the

8  parties' implied-in-fact contract, Rogers has suffered damages of $4.2 million or

9  more, or an amount subject to proof, due to Petersen's breach of his implied-in-fact

10 contract with Rogers.

**Fifth claim for relief: Promissory Estoppel**

**(Against All Defendants)**

13     141.   Rogers incorporates herein by reference all other paragraphs of this

14 Complaint as though fully set forth herein.

15     142.   Petersen made a clear and unambiguous promise that Rogers would be

16 entitled to 20% of profits of the game, as the promise was put in writing.

17     143.   Rogers reasonably and foreseeably relied on that promise to give

18 Petersen and his subsequent alter ego entity, Thunkspace, unlimited rights to use his

19 code.

20     144.   Defendants breached that promise by ceasing all communication with

21 Rogers, shutting him out of the process, launching the game without him, and

22 collecting profits without providing his 20% share.

23     145.   Failure to enforce that promise would create injustice since Rogers

24 would remain uncompensated for his efforts, labor, and expertise, while Defendants

25 profit from his work.

26     146.   As a result, Rogers has suffered harm in that Defendants deprived him

27 of at least $1,678,481, *plus* interest, *plus* one-fifth (20%) of the expected value of

28 future profits from 5D Chess, or in an amount otherwise according to proof.

**Sixth claim for relief: Quantum Meruit**

**(Against All Defendants)**

147.   Rogers incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

148.   If Rogers is unable to recover in contract for services rendered from January through May 2019, then, in the alternative, he should recover for those services in *quantum meruit*.

149.   Petersen explicitly requested Rogers's software engineering services in January.  Petersen reaffirmed his request on behalf of himself and his nascent company, Thunkspace, in April.

150.   Rogers provided those services in good faith from January through May 2019.  He would have continued to provide those services, but for Petersen's cessation of communication and termination of access to their joint workspaces (*e.g.*, the Google doc for 5D Chess).

151.   Those contributions, described above, included but are not limited to: (a) the design and coding of servers and its queuing, matching, message passing, and URL sharing features; (b) the coding the network sockets and serialization operations; (c) building the code base to manage user accounts plus persistence; (d) ideation of gameplay mechanics; (e) designing utility scripts; (f) setting up code repositories; (g) playtesting the game as features were added; and (h) debugging Petersen's code.

152.   Without Rogers's various contributions, 5D Chess would be, at best, inoperable.  At worst, 5D Chess would simply not exist, given Rogers's deep involvement in the birth of 5D Chess, helping forge the idea and write the building blocks of the game's code.

153.   Petersen was aware and knew that Rogers was not providing those services gratuitously. Thunkspace, as Petersen's alter ego, also knew that Rogers did not provide those services gratuitously.  Indeed, Defendants list Rogers in the

public facing credits of 5D Chess, conceding the link between Rogers's services and the development of 5D Chess.  *See* Exhibit D.

154.   Accordingly, both Defendants directly benefited from Rogers's services, work, and expertise.

155.   In view of Petersen's email detailing the shares of profits, and in view of conversations held between Petersen and Rogers where Petersen confirmed his intent to share in the profits of the game, Petersen knew that Rogers reasonably expected to be paid or otherwise compensated for the services he provided.

156.   On information and belief, a reasonable value of Rogers's contributions is at least half of the fair market value of 5D Chess, including past and future discounted cash flows.

157.   Based on the foregoing, Rogers has suffered damages of $4.2 million or more, or an amount subject to proof.

158.   However, neither Defendant has paid or compensated Rogers for his services.  It would be inequitable for Defendants, jointly or severally, to retain the benefits of Rogers's services, as Petersen explicitly promised to share future profits with Rogers for his work.

159.   Furthermore, it would be inequitable for Defendants, jointly or severally, to retain the benefits of Rogers's services when his time as an accomplished software engineer was valued by the market at a rate of at least $158 per hour (not including benefits) during the January to May 2019 timeframe, or at an hourly rate otherwise subject to proof.

160.   Rogers dedicated at least 200 hours from January through May 2019 to the development of the idea and the code behind 5D Chess.

/ / /

/ / /

/ / /

/ / /

**Seventh claim for relief: Copyright Infringement**

**17 U.S.C. §§ 501 *et seq***

**(Against All Defendants)**

161. Rogers incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

162. Rogers and Petersen are co-authors of the original works of 5D Chess, which includes, but not limited to the game's source code, characters, game play mechanics, designs, and trade dress, developed from January through April 8, 2019.

163. Rogers and Petersen own that copyright jointly and equally.

164. The Agreement does not modify the copyright that Rogers and Petersen owned, jointly and severally, prior to the execution of the Agreement.

165. Accordingly, Rogers has joint and several rights in the copyright.

166. On information and belief, Petersen and Thunkspace have unlawfully misappropriated Rogers's software and are making unauthorized reproduction of Rogers's software through their own use, and they are making unauthorized distributions of Rogers's software to their customers.

167. On information and belief, Petersen is inducing Thunkspace's infringement of, and has the right and ability to supervise Thunkspace's infringements of, Rogers's copyrights in the software, and he also has a direct financial interest therein.

168. On information and belief, the infringement of Rogers's copyright by each Defendant has been willful and malicious, respectively.

169. By reason of the foregoing, each Defendant is liable to Rogers for copyright infringement under 17 U.S.C. §§ 501 *et seq*.

**Eighth claim for relief: Conversion (Civil Theft)**

**(Against Petersen)**

170. Rogers incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

171. Intellectual property, such as copyright or software code, constitutes a form of personal property. Intangible property includes a license to use information under a copyright or patent. *See Nortel Networks Inc. v. Bd. of Equalization*, 191 Cal. App. 4th 1259, 1269 (2011).

172. As a partner to their joint venture, Rogers co-owned the code that he created, the code that he and Petersen co-created, and the code that Petersen created.

173. When Petersen cut off all access to the Google Document, Petersen dispossessed Rogers of access to the design ideas they created and their project management tracking.

174. On information and belief, Petersen downloaded his own copy of the repository and saved it elsewhere, allowing him to exercise dominion over the code itself.

175. As a legal and proximate cause of Petersen's conversion, Rogers has lost the ability to derive any commercial value from the code, which is worth somewhere between $4.2 million and $8.3 million in profit, or an amount subject to proof.

176. Petersen's decision to cut off access to the shared Google drive and terminate all communication evinces his intent to abscond with the code.

**Ninth claim for relief: Civil Liability for Receipt of Stolen Property**

**Cal. Penal Code §§ 484, 496(a), 496(c)**

**(Against Thunkspace, LLC)**

177. Rogers incorporates herein by reference all other paragraphs of this Complaint as though fully set forth herein.

178. On information and belief, Thunkspace received copies of the code that Rogers designed and wrote, the code that he and Petersen co-wrote, and the code that Petersen wrote while working under the auspices of a joint venture. Those copies have since been used directly in (and/or served as the basis for) the

1  code of 5D Chess.

2  179.  Thunkspace received those copies from Petersen and retained

3  possession of them.

4  180.  Petersen obtained access to copy that code through fraudulent

5  representations and false pretenses made by Petersen to Rogers—namely, that

6  Rogers would receive compensation in exchange for delivering his code, co-

7  writing code, and helping Petersen test and debug his code, among other

8  contributions.

9  181.  "Every person who shall feloniously steal, take, carry, lead, or drive

10  away the personal property of another, or who shall fraudulently appropriate

11  property which has been entrusted to him or her, or who shall knowingly and

12  designedly, by any false or fraudulent representation or pretense, defraud any other

13  person of money, labor or real or personal property, or who causes or procures

14  others to report falsely of his or her wealth or mercantile character and by thus

15  imposing upon any person, obtains credit and thereby fraudulently gets or obtains

16  possession of money, or property or obtains the labor or service of another, is

17  guilty of theft." Cal. Penal Code § 484(a).

18  182.  Because Thunkspace is the alter ego, agent, and/or entity of Petersen,

19  Thunkspace knew that the code was obtained by theft, as defined by Cal. Penal

20  Code § 484.  Thunkspace is therefore subject to civil liability for violations

21  thereof.

22  183.  Thunkspace knew of the property because it incorporated the code into

23  5D Chess, which it launched commercially.

24  184.  The value of the property exceeds $950, as the software enabled the

25  commercial launch of an online computer game that has earned millions of dollars.

26  //

27  //

28  //

Case 3:23-cv-03281  Document 1  Filed 06/30/23  Page 27 of 41

## IV.  PRAYER FOR RELIEF

WHEREFORE, Rogers prays for judgment:

A.   Ordering equitable relief in the form of specific performance;

B.   Awarding a reasonable royalty;

C.   Awarding pre-judgment interest;

D.   Awarding restitution for unjust enrichment;

E.   Ordering an accounting;

F.   Awarding actual damages under 17 U.S.C. § 504(b) and Cal. Civ. Code § 3300;

G.   Awarding costs and attorneys' fees;

H.   Enjoining the Defendants—including their respective officers, agents, servants, employees, independent contractors, attorneys, and any other person or persons who are in active concert or participation with any of the foregoing—from reproducing, distributing, preparing derivatives from, selling, assigning, transferring, or otherwise infringing Rogers's copyrights in the 5D Chess software, pursuant to 17 U.S.C. § 502;

I.   Awarding Rogers his taxable costs, under at least 28 U.S.C. §§ 1821 & 1920;

J.   Awarding three times actual damages, reasonable attorneys' fees, and cost of suit under at least Cal. Penal Code § 496(c); and,

K.   Enjoining the Defendants from confiscating, forfeiting, disposing of, or otherwise transferring, mortgaging, encumbering, or granting any assets or monies in an amount up of at least $4.2 million to any person or place outside of the Court's jurisdiction;

L.   Awarding such other and further relief as the Court deems just and proper.

26
COMPLAINT

# V.   JURY DEMAND

Plaintiff Nathan Rogers demands a trial by jury on all issues so triable.

**KATZ LAW OFFICE PC**

Date: June 30, 2023                    By:   */s/ Michael Katz*
                                              Michael Katz
                                              Attorney for Plaintiff

27
COMPLAINT

# EXHIBIT A

# Corporations and Charities Filing System

Business Information



## BUSINESS INFORMATION

Business Name:

THUNKSPACE, LLC

UBI Number:

604 538 728

Business Type:

WA LIMITED LIABILITY COMPANY

Business Status:

ACTIVE

Principal Office Street Address:

2239 W AINSLIE ST APT 3, CHICAGO, IL, 60625-6864, UNITED STATES

Principal Office Mailing Address:

2239 W AINSLIE ST APT 3, CHICAGO, IL, 60625-6864, UNITED STATES

Expiration Date:

12/31/2023

Jurisdiction:

UNITED STATES, WASHINGTON

Formation/ Registration Date:

12/12/2019

Period of Duration:

PERPETUAL

Inactive Date:

Nature of Business:

ANY LAWFUL PURPOSE

## REGISTERED AGENT INFORMATION

Registered Agent Name:

**REGISTERED AGENTS INC.**

Street Address:

100 N HOWARD ST STE R, SPOKANE, WA, 99201, UNITED STATES

Mailing Address:

100 N HOWARD ST STE R, SPOKANE, WA, 99201, UNITED STATES

## GOVERNORS

| Title | Governors Type | Entity Name | First Name | Last Name |
|-------|----------------|-------------|------------|-----------|
| GOVERNOR | INDIVIDUAL | | CONOR | PETERSEN |

Back

| Filing History | Name History | Print | Return to Business Search |

# EXHIBIT B

# Conor Petersen's Site



*S_k_ban* - 03/15/2022

Esoteric, even for a puzzlescript game.



*5D Chess With Multiverse Time Travel* - 07/22/2020

It's the first ever chess variant with spatial, temporal, and parallel dimensions. It's 5D Chess With Multiverse Time Travel! Move pieces back in time to create branching timelines. Send a rook to a parallel dimension. Protect your kings in the present and in the past!

www.5dchesswithmultiversetimetravel.com



*Enchanted Warehouse* - 01/30/2020

A small puzzlescript game.

## Subscribe to my mailing list:

email address

Subscribe

## Business Contact:

business@thunkspace.com



# EXHIBIT C

 Gmail                                                    Nathan Rogers <nathan.sw.rogers@gmail.com>

---

## Autoches agreement

**Nathan Rogers** <nathan.sw.rogers@gmail.com>                          Tue, Apr 9, 2019 at 1:45 AM
To: Conor Petersen <conorpetersen@gmail.com>

Looks good to me.  Agreed.

On Sun, Apr 7, 2019, 8:54 PM Conor Petersen <conorpetersen@gmail.com> wrote:
Music notes: it's either my responsibility or we agree to pay licensing/commission to get music, payed before profit.

On Sun, Apr 7, 2019 at 5:53 PM Conor Petersen <conorpetersen@gmail.com> wrote:
Your responsibilities:
Server features excluding server-side gameplay logic:
- All server features facilitating matches, such as queueing, message passing, etc. Incl 1v1 challenges via challenge url (not friends list).
- User accounts (or assignment of anonymous accounts), plus persistence for accounts via cloudsave or something.
- Story for running multiple versions of the game server in parallel to accommodate multiple supported published versions (across stores, or platforms).
- Written instructions for operating the server post-release.
- Account persistence via cloud saved handle (put a uuid in a text file and cloud save it)
Android port
- Get SDL and all our dependencies working on android.
- Multiplatform capabilities of server and account logic proven by support of android as first non-pc platform.

My responsibilities:
Everything not listed above, including but not limited to:
- Make the game, design, programming, art, sound effects (music: notes below).
- Make decisions regarding marketing and distribution of the game.
- Manage self publishing accounts for all platforms.
- Operate server post-release (relevant stories planned aot).
- iphone/mac port.

The game will be published under an entity entirely owned and managed by me.

You get 20% of profit from the game. Profit is dollars after storefront/publishing costs.

I own the game, all copyrights related to the art/name of the game, all my code, and have unlimited right to use your code for this game.

# EXHIBIT D

5D Chess

## Playtesting and Feedback
Steven Sagona-Stophel
Sam van der Poel
Dmitro Gubenko

## Testing and Feedback
Toph Wells
Ethan Clark
knexator
Steven Miller
NotAJumbleOfNumbers
www.Combo.Zone

## Additional Thanks
Nathan Rogers
Mārtiņš Možeiko
Alan Hazelden

## Linux and Mac Ports

# EXHIBIT E

**APP DATA**

# 5D Chess With Multiverse Time Travel



It's the first ever chess variant with spatial, temporal, and parallel dimensions. It's 5D Chess With Multiverse Time Travel! Move pieces back in time to create branching timelines. Send a rook to a parallel dimension. Protect your kings in the present and in the past!

Store (http://store.steampowered.com/app/1349230) | Hub (http://steamcommunity.com/app/1349230) | SteamDB (https://steamdb.info/app/1349230) | Site (https://www.5dchesswithmultiversetimetravel.com)

**Developer:** Conor Petersen (/dev/Conor+Petersen), Thunkspace, LLC (/dev/Thunkspace%2C+LLC) **Publisher:** Conor Petersen (/dev/Conor+Petersen), Thunkspace, LLC (/dev/Thunkspace%2C+LLC)

**Genre:** Indie (/genre/Indie)

**Languages:** English (/language/English)

**Tags:** Chess (/tag/Chess) (1201), Time Travel (/tag/Time+Travel) (1081), Survival Horror (/tag/Survival+Horror) (1039), Time Manipulation (/tag/Time+Manipulation) (870), Board Game (/tag/Board+Game) (715), Puzzle (/tag/Puzzle) (637), Multiplayer (/tag/Multiplayer) (548), Difficult (/tag/Difficult) (532), Turn-Based Strategy (/tag/Turn-Based+Strategy) (474), Strategy (/tag/Strategy) (438), Turn-Based Tactics (/tag/Turn-Based+Tactics) (396), Singleplayer (/tag/Singleplayer) (344), PvP (/tag/PvP) (312), Gore (/tag/Gore) (262), Artificial Intelligence (/tag/Artificial+Intelligence) (239), Indie (/tag/Indie) (228), Dating Sim (/tag/Dating+Sim) (224), Nudity (/tag/Nudity) (202), Sci-fi (/tag/Sci-fi) (180), Colorful (/tag/Colorful) (94)

**Category:** Single-player, Multi-player, PvP, Online PvP, Shared/Split Screen PvP, Shared/Split Screen, Remote Play Together

**Release date**: Jul 22, 2020

**Price:** $11.99

**Old userscore:** 96% **Owners**: 500,000 .. 1,000,000

**Followers**: 18,473

**Peak concurrent players yesterday**: 55

**YouTube stats**: 0 new videos uploaded yesterday.

**Playtime in the last 2 weeks:** 00:06 (average) 00:06 (median)

**Playtime total:** 08:28 (average) 10:17 (median)

Steam Spy is still in beta, so expect major bugs.

OWNERS     AUDIENCE (2 WEEKS)     CCU (DAILY)     CCU (HOURLY)     FOLLOWERS

REVIEWS     MORE LIKE THIS     RELATED     GEOGRAPHY OVER TIME (SHARE)

TAGS OVER TIME     PLAYTIME (TOTAL)     PLAYTIME (2 WEEKS)

# Owners data:

# Access restricted.

This feature is only available to users with special access rights. Sorry.

If you want to proceed, you need to register (/register/) or log in (/login/) first and then **back Steam Spy on Patreon (https://patreon.com/steamspy)**. Look for Indie or Pro pledge.

Don't forget to use the same email as on Steam Spy!

If you've recently backed Steam Spy on Patreon, please note, that it might take around 15 minutes for your access rights to sync. In most cases you'll need to re-login on Steam Spy too.

Copyright © 2015-2021 Sergey Galyonkin (http://galyonkin.com) Steam_Spy (http://twitter.com/Steam_Spy)

Powered by Steam (http://steampowered.com)   |   About (/about)   |   Privacy Policy (/privacy)